UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| JOHNNIE L. JACOBS,<br><br>        Plaintiff,<br><br>    v.<br><br>PAMELA BONDI,[1]<br><br>        Defendant. | Case No. 22-cv-654-MJS |

**MEMORANDUM OPINION**

      Between 2011 and 2015, Plaintiff Johnnie Jacobs worked in the Federal Bureau of Investigation's ("FBI") Office of Equal Employment Opportunity Affairs as an Equal Employment Opportunity ("EEO") Investigator. In 2015, the FBI denied Jacobs' request for another annual extension in the role—one year short of the full five years available for the position. According to the FBI, this decision was driven by Jacobs' "mediocre performance" amid "widescale efforts to improve the EEO Office." Jacobs says otherwise. Invoking Title VII of the Civil Rights Act of 1964 ("Title VII"), he contends that the FBI's decision to oust him from that job was driven by discrimination based on his sex. Following discovery, the FBI moved for summary judgment, and the matter is fully briefed and ripe for decision. Because genuine disputes of material fact preclude entry of judgment as a matter of law, the Court **DENIES** the FBI's motion.

---

[1] Jacobs originally sued Attorney General Merrick Garland, but his successor, current Attorney General Pamela Bondi, is automatically substituted as the named party defendant. Fed. R. Civ. P. 25(d).

1

**FACTUAL BACKGROUND**

The following facts are either undisputed or construed in favor of Jacobs as the non-moving party. Fed. R. Civ. P. 56(a); *Holcomb v. Powell*, 433 F.3d 889, 895 (D.C. Cir. 2006).

Jacobs is a white male who worked for the FBI for decades, from 1990 until his eventual retirement in 2021. (ECF No. 17-1 ("Def.'s Stmt.") ¶¶ 8, 40.)[2] In 2011, he was employed as a GS-13 Special Agent with the FBI's Washington Field Office when he successfully applied for an internal vacancy as a GS-14 EEO Investigator in the FBI's EEO Office. (*Id.* ¶¶ 1, 8–9.)

The FBI's EEO Office is responsible for processing internal EEO complaints, reasonable accommodation requests, and other programs related to the EEO process within the FBI. (Def.'s Stmt. ¶ 1.) The EEO Office is staffed in part by GS-14 Supervisory Special Agents who serve as EEO Investigators responsible for investigating complaints. (*Id.* ¶ 2.) Broadly speaking, EEO Investigators identify and interview witnesses, obtain sworn statements from witnesses, gather relevant documents, and compile materials into a Report of Investigation or "ROI." (*Id.*)

EEO Investigators are selected for an initial two-year term, with the possibility of three one-year extensions, for a total possible term of up to five years. (Def.'s Stmt. ¶ 4.) When an employee serves as an EEO Investigator through a term promotion—as was true for Jacobs—management retains the discretion to end the term promotion at any time. (*Id.* ¶ 5.) At the end of a full five-year term appointment (including extensions), the position must be reposted, but the incumbent candidate is eligible to reapply and compete for the vacancy. (*Id.* ¶ 4 n.2.)

As noted, Jacobs was selected and began working as an EEO Investigator in July 2011. (Def.'s Stmt. ¶ 9.) Jacobs completed his initial two-year term in July 2013, and he twice received

---

[2] Unless otherwise indicated, where the Court cites to the FBI's Statement of Facts, this is because Jacobs expressly admits the corresponding factual paragraph(s). (*See* ECF No. 19-1 ("Pl.'s Stmt.").)

one-year extensions thereafter—the first through July 2014, and the second through July 2015. (*Id.*) But when it came time for his third and final extension in 2015, the FBI said, "No."

At that time, Jacobs reported to first-line supervisor Jessica Rovell—Deputy EEO Officer and Unit Chief of the Complaints Processing Unit—and second-line supervisor Kevin Walker—Assistant Director of EEO Office. (Def.'s Stmt. ¶¶ 10, 17.) Rovell started in June 2014, while Walker stepped into his role a few years earlier in September 2012. (*Id.*)

During his tenure, Walker aimed to improve the complaint processing time in the EEO Office. Under applicable regulations, the EEO Office is supposed to complete its investigation of a formal complaint within 180 days, and EEO Investigators were generally allocated up to 45 days to complete their piece of an investigation and prepare an ROI. (Def.'s Stmt. ¶¶ 12–14.) Soon after arriving, Walker held a division-wide meeting to stress the importance of these deadlines and reiterated the point to EEO Office staff over the years. (*See id.*) In July 2014, Walker and Rovell began implementing new policies aimed at fulfilling these goals, including new standard operating procedures and a mission statement, both of which stressed the importance of the 45-day deadline for EEO Investigators and the overall 180-day complaint-processing deadline. (*Id.* ¶¶ 19–21.)[3]

Against this backdrop, the FBI proffers that by the spring of 2015, Jacobs "was not a strong investigator," including because he "struggled to complete his investigations in a timely manner" and "regularly exceeded the 45-day deadline." (Def.'s Stmt. ¶¶ 24, 26.)

Jacobs adamantly contests these criticisms. Among other things, he points to his year-end 2013 and 2014 performance appraisals, through which he received overall ratings of "Excellent." (*Id.* ¶ 32.) "Excellent" was one of the highest ratings available, second only to "Outstanding." (*See* ECF No. 19-4, Pl.'s Ex. 3; ECF No. 19-5, Pl.'s Ex. 4.) Jacobs' 2013 performance appraisal

---

[3] Plaintiff objects to the relevance of these facts but does not dispute them. (Pl.'s Stmt. ¶¶ 12–14, 19–21.)

predated Rovell's tenure with the EEO Office, but it was reviewed and approved by Walker. (Pl.'s Ex. 3.) That said, Rovell did complete Jacobs' 2014 performance appraisal, which was likewise approved by Walker. In that appraisal, Rovell included the following narrative commentary:

> During the rating period, SSA Jacobs' skill and expertise were significant assets to the Complaints Processing Unit (CPU), and he contributed to the overall effectiveness and efficiency of CPU's mission accomplishment.
>
> His performance was Outstanding in terms of oral and written communication. Specifically, his Reports of Investigation rarely required editing or additional work post-submission, which enabled CPU staff to process and disseminate them more quickly.
>
> SSA Jacobs also provided valuable suggestions to … management concerning process and work-environment improvement. Again, his contributions to the unit and the division were significant during the rating period.

(Pl.'s Ex. 4 at ECF p. 3) Relatedly, on May 4, 2015, in connection with Rovell's midyear evaluation of Jacobs' performance, Rovell wrote to Jacobs in relevant part: "You're doing a fine job with some difficult cases so far this year." (ECF No. 20-1, Pl.'s Ex. 9.) Rovell encouraged Jacobs to use "a bit more communication when [his cases] are running over the 45-day guideline," but she closed her message to Jacobs by stating, "thanks for the great work!" (*See id.*)

Less than a month later, on June 2, 2015, Rovell broke the news to Jacobs that his term as an EEO Investigator would not be extended for a fifth year. (Def.'s Stmt. ¶¶ 36–37.) According to Jacobs' sworn testimony, Rovell told him the decision was based on a plan to "increase the turnover" in the EEO Office, that Jacobs' "performance was not a factor in the decision," and that "she was pleased with [his] performance." (ECF No. 21-5, Pl.'s Ex. 19 at ECF p. 4; *see also* ECF No. 17-4, Def.'s Ex. 2 (Jacobs Dep.) at ECF p. 21 ("[Rovell] said … she and Mr. Walker had talked about increasing turnover … and for that reason I would not be renewed …. And I asked her if I had – if I had done something wrong and she said no, I have no issues with your performance, performing has nothing to do with this, it's just that we need more turnover.").)

4

In a group call about a week later, Jacobs asked Walker about "increasing turnover." According to Jacobs' testimony, Walker said that although he did not foresee anyone staying beyond five years, he did not have a categorical objection to EEO Investigators being extended within their overall five-year term. (Def.'s Ex. 2 (Jacobs Dep. at ECF p. 23.) Jacobs then requested a follow-up call with Walker, during which Walker begrudgingly told Jacobs that the decision against renewing him was, in fact, based on concerns about his performance. (Pl.'s Ex. 19 at ECF p. 5 (cited in Def.'s Stmt. ¶ 38); *see also* Def.'s Ex. 2 (Jacobs Dep.) at ECF p. 24.)

Walker did secure a short-term extension of Jacobs' assignment through August 8, 2015, to help him transition, but Jacobs rejected that offer. (Def.'s Stmt. ¶ 39.) Jacobs returned to his GS-13 Special Agent position in the Washington Field Office effective July 26, 2015. (*Id.* ¶ 40.)

Jacobs highlights that as of June 2014, the eight-member "Investigative Squad" in the EEO Office comprised five women and three men, whereas a year or so later— effective August 2015, shortly after Jacobs' departure—the group comprised eight women and no men. (Pl.'s Stmt. ¶ 15 (citing ECF No. 19-7, Pl.'s Ex. 6 (organizational charts)).) For its part, the FBI does not dispute these demographic breakdowns, as the Court confirmed during the motions hearing. But the FBI does point out that the other two men voluntarily retired, which Jacobs does not dispute.

## ANALYSIS

Jacobs claims that the FBI unlawfully discriminated against him based on sex in violation of Title VII when it failed to extend his term as an EEO Investigator in or around July 2015.

### I.     Standard of Review

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986). "A genuine issue of

5

material fact exists if the evidence, viewed in a light most favorable to the nonmoving party, could support a reasonable jury's verdict for the nonmoving party." *Figueroa v. Pompeo*, 923 F.3d 1078, 1085 (D.C. Cir. 2019) (citation and quotation marks omitted). In carrying out this analysis, the Court does not "weigh the evidence and determine the truth of the matter" but instead determines only "whether there is a genuine issue for trial." *Waggel v. George Washington Univ.*, 957 F.3d 1364, 1371 (D.C. Cir. 2020) (citation and quotation marks omitted). "The movant bears the initial burden of demonstrating that there is no genuine issue of material fact." *Montgomery v. Risen*, 875 F.3d 709, 713 (D.C. Cir. 2017). "In response, the non-movant must identify specific facts in the record to demonstrate the existence of a genuine issue." *Id.*

## II.    Jacobs' Title VII Sex Discrimination Claim

### A.    Applicable Legal Framework

"Title VII prohibits federal agencies from discriminating against their employees on the basis of race, color, religion, sex, or national origin." *Johnson v. Perez*, 823 F.3d 701, 706 (D.C. Cir. 2016) (citing 42 U.S.C. § 2000e–16(a)). In Title VII cases that do not present direct evidence of discrimination, as here, courts employ the long-utilized burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), to evaluate the claims. *See Wheeler v. Georgetown Univ. Hosp.*, 812 F.3d 1109, 1113 (D.C. Cir. 2016); *Chappell-Johnson v. Powell*, 440 F.3d 484, 487 (D.C. Cir. 2006). Under this framework, the plaintiff bears the initial burden of establishing a prima facie case of discrimination. *Wheeler*, 812 F.3d at 1113–14. "[T]he burden then shifts to the employer to articulate a legitimate, nondiscriminatory reason for its action." *Id.* at 1114. Finally, the burden reverts to the plaintiff to show "the employer's stated reason for its actions was in fact pretext for unlawful discrimination." *Id.*; *see also Figueroa*, 923 F.3d at 1086

(reiterating that the plaintiff retains "the burden of proving that the defendant intentionally discriminated against her").

Because the burden-shifting framework aims to progressively "sharpen the inquiry into the elusive factual question of intentional discrimination," the D.C. Circuit has endorsed a "shortcut" through the back-and-forth steps. *Figueroa*, 923 F.3d at 1086–87 (citation and quotation marks omitted). So long as the employer "properly presents a legitimate, nondiscriminatory reason," then courts "'need not—and should not—decide whether the plaintiff actually made out a prima facie case'" at step one. *Id.* at 1087 (quoting *Brady v. Office of Sergeant at Arms*, 520 F.3d 490, 494 (D.C. Cir. 2008)). Courts should instead focus on "one central inquiry": "whether the plaintiff produced sufficient evidence for a reasonable jury to find that the employer's asserted non-discriminatory reason was not the actual reason and that the employer intentionally discriminated against the plaintiff on a prohibited basis." *Wheeler*, 812 F.3d at 1114. In considering that question, courts do not "sit as a super-personnel department that reexamines an employer's business decisions," meaning they "may not second-guess an employer's personnel decision absent demonstrably discriminatory motive." *Id.*; *see also Fischbach v. D.C. Dep't of Corr.*, 86 F.3d 1180, 1183 (D.C. Cir. 1996) (explaining that the focus "is not the correctness or desirability of [the] reasons offered ... [but] whether the employer honestly believes in the reasons it offers").

### B.  The FBI's Proffered Nondiscriminatory Rationale(s)

The FBI rebuffs Jacobs' claim of discrimination here, insisting that its decision to not extend his term as an EEO Investigator was based on a legitimate and nondiscriminatory rationale—namely, Jacobs' "mediocre performance during wide-scale efforts to improve the EEO office." (ECF No. 17-2 ("Def. Mem.") at 2.)[4] Separately, the FBI contends that Jacobs' alleged

---

[4] When citing to the parties' briefs, the Court uses the page numbers assigned by the electronic filing system.

"misconduct" in sending and receiving "numerous inappropriate emails," including allegedly "inappropriate comments about race and diversity," amounts to "another legitimate, non-discriminatory justification for not extending [his] term position." (*Id.* at 20.)

The Court can dispense quickly with the second rationale because the FBI acknowledges that it did not know about any of the allegedly "inappropriate emails" at the time of its decision. (Def.'s Mem. at 20 ("Walker was not aware of these communications during [Jacobs'] tenure as an EEO investigator."); ECF No. 23 ("Def.'s Reply") at 20 (explaining that the emails surfaced for the first time "while litigating this matter before the [EEOC]," well after the non-extension decision).) In other words, the evidence the FBI puts forward on this point is "after-acquired evidence," *i.e.*, evidence discovered after the challenged employment action. *See McKennon v. Nashville Banner Publ'g Co.*, 513 U.S. 352, 359–60 (1995). And the Supreme Court in *McKennon* held that after-acquired evidence—which, by definition, the employer did not have at the applicable decision point—cannot give rise to a legitimate, nondiscriminatory reason for purposes of defending against a discrimination claim because an "employer could not have been motivated by knowledge it did not have" at the time. *Id.* at 360.[5] Whether and to what extent the FBI might be able to introduce evidence of Jacobs' allegedly "inappropriate" email communications to argue at trial that certain remedies should be unavailable or at least limited, *see McKennon*, 513 U.S. at

---

[5] *See also, e.g.*, *Kapche v. Holder*, 677 F.3d 454, 464 (D.C. Cir. 2012) (explaining that "evidence of the plaintiff's wrongdoing acquired subsequent to an employer's discriminatory hiring decision does not negate liability" but can be "relevant in determining whether equitable relief is available to the plaintiff"); *Delli Santi v. CNA Ins. Cos.,* 88 F.3d 192, 205 (3d Cir. 1996) ("After-acquired evidence, simply put, is not relevant in establishing liability under Title VII … because the sole question to be answered at that stage is whether the employer discriminated against the employee on the basis of an impermissible factor *at the instant of the adverse employment action*.") (emphasis added) (citation omitted); *Smith v. Conway Org., Inc.*, 871 F. Supp. 196, 201 (S.D.N.Y. 1994) (explaining that *McDonnell Douglas* "presupposes a legitimate, nondiscriminatory reason *known to the employer at the time of the employment action*," which cannot be based on "after-acquired evidence") (emphasis added); *Seitz v. Lane Furniture Indus., Inc.*, 2008 WL 4346439, at *17 n.17 (N.D. Ohio Sept. 17, 2008) ("[A]fter-acquired evidence … cannot serve as a legitimate non-discriminatory reason for purposes of the *McDonnell Douglas* analysis.").

360–63, is a different question for a different day. But the FBI's attempt, at this juncture, to secure summary judgment on liability on this theory is a non-starter.

The FBI's other proffered rationale—Jacobs' "mediocre" job performance as of June 2015—is another story because it was ostensibly based on information known to the FBI at the time. More specifically, the FBI asserts that Jacobs: "exceeded his forty-five-day deadline for investigations more times than it was met," "had one of the highest average investigation times," "failed to keep his supervisor apprised of the status of his investigations and potential issues," produced work-product that "frequently required additional investigation and review," "did not appear dedicated to his work," and "seemed to lack motivation to do more than the bare minimum." (Def.'s Mem. at 16 (citing Def.'s Stmt. ¶¶ 26–31).) These propositions, coupled with the FBI's supporting evidentiary proffer, are enough to carry the FBI's burden under *McDonnell Douglas* to articulate a legitimate, nondiscriminatory reason for declining to extend Jacobs' tenure in the EEO Office. *See Figueroa*, 923 F.3d at 1087–88 (explaining the need for an "adequate evidentiary proffer" for an employer's rationale, which should include "a clear and reasonably specific explanation" supported by "admissible" evidence that "a factfinder may consider at trial").

So the Court turns to the final step of the analysis without deciding whether Jacobs established a *prima face* case of discrimination. Instead, the "central question" is whether Jacobs has come forward with sufficient evidence to allow a reasonable jury to find the FBI's "mediocre performance" rationale is false and a pretext for discrimination. *See Wheeler*, 812 F.3d at 1114.

C.  **Jacobs Raises a Triable Question of Pretext**

In the D.C. Circuit, there is no one-sized-fits-all approach to demonstrate a triable issue of pretext under *McDonnell Douglas*. Among other things, a plaintiff can point to "the employer's better treatment of similarly situated employees outside the plaintiff's protected group, its

9

inconsistent or dishonest explanations, … or other relevant evidence that a jury could reasonably conclude evinces an illicit motive." *Wheeler*, 812 F.3d at 1115 (quoting *Walker v. Johnson*, 798 F.3d 1085, 1092 (D.C. Cir. 2015)). Through this effort, "a plaintiff need not present evidence over and above rebutting the employer's stated explanation in order to avoid summary judgment, but he must present evidence from which a reasonable jury could reject the employer's proffered explanation." *Oviedo v. Wash. Metro. Area Transit Auth.*, 948 F.3d 386, 395 (D.C. Cir. 2020); *see also Allen v. Johnson*, 795 F.3d 34, 40 (D.C. Cir. 2015) ("Typically, successful rebuttal of an employer's stated reason counts as evidence of the invidious motive that is a required element of a disparate treatment or retaliation claim."); *Jones v. Bernanke*, 557 F.3d 670, 679 (D.C. Cir. 2009) ("Though evidence of pretext is not *per se* sufficient to permit an inference of discrimination, it usually will be enough to get a plaintiff's claim to a jury.") (cleaned up).

Here, Jacobs focuses on three major points in attempting to demonstrate a triable issue of pretext, specifically that: (1) the FBI put forward shifting and inconsistent justifications as to why leadership did not extend his term; (2) the FBI's evidence of his "mediocre" performance is lacking and undercut by contrary evidence of strong performance; and (3) after his departure, the composition of EEO Investigators shifted from a balance of men and women to a roster comprising solely women. (ECF No. 19 ("Pl.'s Opp'n") at 18–22.) The Court discusses each in turn.

***First***, Jacobs argues that a jury could find pretext because the FBI offered shifting explanations for its decision. According to Jacobs, when Rovell delivered the news that he would not be extended for a fifth year in the EEO Office, she said the decision was driven by a goal to "increase turnover" and expressly disclaimed that it had anything to do with Jacobs' job performance. (Pl.'s Ex. 19 at ECF p. 4; Def.'s Ex. 2 (Jacobs Dep.) at ECF p. 21.) In fact, Rovell went even further—assuring Jacobs that she "was pleased with [his] performance" and had "no

issues" with it, at least by Jacobs' telling. (*See id.*) But then, barely a week later, Walker told Jacobs that the decision was based on his performance. (Pl.'s Ex. 19 at ECF p. 5; Def.'s Ex. 2 (Jacobs Dep.) at ECF p. 24.) And, of course, Jacobs' "mediocre performance" is the primary justification invoked by the FBI in defending against Jacobs' claim in this litigation.

These kinds of "shifting and inconsistent justifications" can be "probative of pretext." *Geleta v. Gray*, 645 F.3d 408, 413 (D.C. Cir. 2011); *see also Evans v. Sebelius*, 716 F.3d 617, 620–21 (D.C. Cir. 2013) (similar). To be sure, not every minor variation or difference in how an employer articulates an explanation over time will rise to the level of a material inconsistency. *See, e.g.*, *Oviedo*, 948 F.3d at 398–99 (finding shifting-explanations argument "unsupported" where three allegedly different articulations all "s[a]ng the same tune" about a misalignment of the plaintiff's "skills and expertise"); *Walker*, 798 F.3d at 1094 (same as to "minor variations" in the decisionmaker's account of whether the plaintiff "dropped" or "tossed" or "swiftly placed" or "slammed" something on a desk because "every account describes [plaintiff] as terse and abrupt" despite the "descriptive differences"). But the inconsistencies here are about as stark as they come. Based on the evidence put forward by Jacobs, the FBI did a complete about-face—going from categorically disclaiming that its decision was related to his job performance, to invoking the very performance-related rationale it disclaimed. *See Casselle v. Chao*, 270 F. Supp. 3d 314, 326 (D.D.C. 2017) (denying summary judgment where plaintiff testified that his supervisor "never mentioned" the need for certain expertise as a reason for his non-selection during initial "debriefing call," but the agency invoked that rationale in litigation); *cf. Chien v. Pompeo*, 2020 WL 10457008, at *3 (D.D.C. Dec. 7, 2020) (denying summary judgment where plaintiff was originally told the rationale was a "broken handshake agreement" but later learned it "had to do with something out of L.A." and was told unequivocally that the "handshake agreement" had no ramifications). Based

11

on these materially different explanations, a reasonable jury could conclude that the FBI's litigation-facing justification is false and pretextual.

The FBI's only real rebuttal to these inconsistencies is to argue that Jacobs "cannot create pretext simply by pointing to his own characterizations of his alleged conversations with Walker and Rovell." (Def.'s Reply at 17.) But that is not a correct statement of the law. The opposite is true at the summary judgment phase: the Court must construe the facts in the light most favorable to Jacobs, as the non-moving party, at least where Jacobs supports those facts with competent evidence. Fed. R. Civ. P. 56(c). And here, Jacobs cites to sworn statements—both his affidavit and his deposition testimony—that recount the FBI's shifting explanations as voiced at different junctures. The Court cannot ignore or discount that evidence at summary judgment simply because it is uncorroborated by other witnesses. In the words of the D.C. Circuit, the fact that Jacobs' testimony may be uncorroborated makes "no difference." *Robinson v. Pezzat*, 818 F.3d 1, 9 (D.C. Cir. 2016) ("Corroboration goes to credibility, a question for the jury, not the district court."); *Townsend v. United States*, 2019 WL 4060318, at *7 (D.D.C. Aug. 27, 2019) ("The fact that a plaintiff's testimony is uncorroborated is immaterial for purposes of summary judgment[.]"); *Vasser v. Shulkin*, 280 F. Supp. 3d 9, 20 n.6 (D.D.C. 2017) ("[T]he case law is clear that a plaintiff need not present corroborating evidence.") (collecting cases).[6]

The FBI separately posits that any discrepancy in what Jacobs was told in those early discussions can be chalked up to his managers' efforts to be magnanimous —Walker "was trying to let him down easy," and Rovell didn't "want to further antagonize the situation." (Def.'s Reply

---

[6] The FBI cites two cites for this argument: *Moses v. Kerry*, 110 F. Supp. 3d 204, 213 n.14 (D.D.C. 2015), and *Johnson v. Joo*, 2006 WL 627154, at *36 (D.D.C. Mar. 12, 2006). Neither helps. Those cases correctly refused to credit *speculation and conjecture*, but that is not what Jacobs proffers here. He relies on his own detailed and specific testimony about remarks that Rovell and Walker reportedly made directly to him.

at 17.) Although "there may well be a benign explanation for the[] shifting rationales," *Evans*, 716 F.3d at 621, that argument is one for a jury—not something the Court can resolve at this stage.[7]

***Second***, Jacobs directly assails the FBI's performance criticisms and says he put forward sufficient evidence to allow a reasonable jury to find that justification untrue. The Court agrees.

For starters, Jacobs' 2014 annual performance appraisal "tends to refute the suggestion that [he] had problems on the job." *George v. Leavitt*, 407 F.3d 405, 414 (D.C. Cir. 2005). Rovell completed that appraisal as Jacobs' first-line supervisor, and Walker signed off on it. These are the same two individuals whose assessment the FBI now relies on to argue that Jacobs' performance was lacking. In that appraisal, though, Rovell not only assigned Jacobs an overall "Excellent" rating (the second highest rating available), but she also included several narrative comments attesting to Jacobs' positive workplace contributions. (Pl.'s Ex. 4.) The appraisal contains nothing in the way of negative feedback; in fact, the lowest individual rating level assigned was "Successful" (in two out of seven categories), with the rest at "Excellent" or even "Outstanding." (*See id.*)[8] Additionally, and relatedly, Jacobs points to an email from Rovell—sent mere weeks before she communicated the non-extension decision—in which she told Jacobs he was "doing a fine job with some difficult cases so far this year" and closed by saying, "thanks for the great work!" (Pl.'s Ex. 9.) This evidence, at least on the particular facts here, creates a genuine dispute of material fact about the legitimacy of the FBI's proffered performance-based rationale.

---

[7] Indeed, other cases have denied summary judgment based *solely* on an employer's shifting and inconsistent justifications. *See, e.g.*, *Pelton v. DeJoy*, 2024 WL 1961297, at *13 (D.D.C. May 3, 2024) (denying summary judgment where supervisor testified that the plaintiff was required to recertify her leave "because she had not included a case number on her leave slip," even though his earlier affidavit said the recertification was "because she was not using leave consistently with her approved FMLA request").

[8] Jacobs' 2013 appraisal (Pl.'s Ex. 3) presents a similar issue, but it was prepared by Rovell's predecessor (albeit still approved by Walker), so it is less probative of pretext. *See, e.g.*, *Craig v. Mnuchin*, 278 F. Supp. 3d 42, 59 (D.D.C. 2017) ("[C]ourts in this Circuit have routinely refused to infer discriminatory pretext merely because a subsequent supervisor departs from a prior supervisor's appraisal.").

This is true even though the record contains at least some "evidence to support [the FBI's] claim that [Jacobs] had … performance deficiencies." *George*, 407 F.3d at 414; *see also Fitzig v. Mayorkas*, 2023 WL 2631491, at *13 (D.D.C. Mar. 23, 2023) (reaching similar conclusion, where employer invoked performance issues as a nondiscriminatory rationale for plaintiff's termination but "his performance review … paint[ed] a different picture").[9]

Moreover, turning to some of the specifics, Jacobs' evidence creates a genuine dispute about whether the FBI's chief criticism—that Jacobs "had one of the highest average investigation times" of the EEO Investigators in the group—is the rationale that truly drove its decision. (Def.'s Stmt. ¶ 27.) The FBI's assessment rests in substantial part on "Production Reports" that include various statistics for each EEO Investigator. The report from early May 2015, for example, indicates that Jacobs had an "ROI Average Completion Time" of 105 days—well above the 45-day goal. (ECF No. 19-8, Pl.'s Ex. 7.) So far, that tracks, at least on its face. But Jacobs highlights some broader context. For one thing, other EEO Investigators had similarly high averages, including one colleague with a 102-day average and another with a 101-day average. (*See id.*) Yet the FBI did not similarly oust those investigators. One retired, but Rovell extended the other—a female colleague, M.M.—that same year, in 2015. (ECF No. 19-3 (Rovell Dep.) at ECF p. 20.)

The FBI argues, without case support, that this individual is not a proper comparator because she had already "announced retirement plans." (*See* Def.'s Mem. at 18 (arguing that Plaintiff "was the only poor performer without previously announced retirement plans"); Def.'s Reply at 6 ("She had stated that she was retiring.") But even if true—and the point seems at least

---

[9] Of course, a prior positive review is not always a silver bullet to create an issue of pretext as to an employer's performance-based rationale. Where an employee's performance declines after the positive review, for instance, that's a different scenario. *See, e.g.*, *Simms v. Duffy*, 2025 WL 823905, at *5 (D.D.C. Mar. 14, 2025) (citing *Williams v. Smithsonian Inst.*, 2019 WL 3859155, at *8 (D.D.C. Aug. 16, 2019)). But here, the FBI offers almost no evidence to show that Jacobs' performance deteriorated sharply after his 2014 review. If anything, Rovell's positive email to Jacobs in May 2015 seems to undercut that prospect.

somewhat undercut by Rovell's deposition testimony that M.M. was extended for several years beyond 2015—the Court fails to appreciate why future retirement plans would place someone in a materially different spot than Jacobs. After all, Jacobs had completed four out of his five years in the role, so another extension would only mean one more year before he would have to reapply and compete for the position after a vacancy was posted. In other words, if the FBI's suggestion is that it was more willing to overlook less-than-ideal performance by employees whose time in the EEO Office would be limited because of "announced retirement plans," it is unclear why the same would not be true for Jacobs, whose time in his role was similarly limited (unless he reapplied and was selected through a full hiring process after competing against other qualified applicants).

More than that, Jacobs continues, average investigation times are not a useful performance measure in a vacuum anyway, at least not without considering "the complexity" of the cases being measured. (Pl.'s Opp'n at 12, 18.) And on that score, Jacobs points to information he gleaned from discovery—which the FBI agrees is accurate, at least in material part (*see* Def.'s Reply at 9 n.5)—demonstrating that Jacobs' investigations in 2015 involved 90 total witnesses (of which 25 were "Senior Executive Service" or "SES" witnesses), whereas the investigations completed by Jacobs' five female colleagues in 2015 involved far fewer witnesses, ranging from 35 to 44 (of which only 6 or 7 were SES witnesses). (Pl.'s Opp'n at 12; Pl.'s Stmt. ¶ 24.)[10] The takeaway, according to Jacobs, is that his cases took longer to complete on average because they were more complex and required him to gather information from many more witnesses, including many more senior-level witnesses. The FBI disagrees, rejoining that "the number of witnesses does not automatically correlate with case complexity." (Def.'s Reply at 9 n.5.) Neither proposition strikes the Court as

---

[10] The FBI clarifies a few of these statistics, although most of the corrections result in a reduction of the number of witnesses for Jacobs' colleagues; the one exception is an investigator whose investigations, according to the FBI, involved 46 total witnesses, of which 11 were SES witnesses. (Def.'s Reply at 9 n.5.) Even crediting the FBI's figures, the overall point that Jacobs is trying to paint remains the same.

15

unavoidably correct, but it is not the Court's role to resolve that dispute at summary judgment. It is enough to say Jacobs' statistics at least raise a triable issue of fact as to whether the FBI honestly believed that Jacobs was a subpar performer because of his average case completion times.

*Third*, Jacobs emphasizes the overall demographics of the EEO Investigators before and after his ouster to argue for an inference that sex-based discrimination played a role in the FBI's decision not to extend his term for a final year. More specifically, the undisputed facts reflect that as of June 2014, the unit comprised five women and three men, whereas in August 2015, the unit comprised all women and no men. (Pl.'s Opp'n at 10 (chart).) For its part, the FBI acknowledges these facts but points out that the other two men retired, meaning Jacobs was the only one whose role in the group ended involuntarily. (Def.'s Reply at 16.) More, the FBI contends that leadership "begged" one of Jacobs' retiring male colleagues to stay (*see id.*), which the FBI says undercuts any suggestion of sex-based animus on the part of Rovell and Walker.

Even acknowledging the FBI's counterpoints, the fact remains that three male EEO Investigators were all replaced by female EEO Investigators. This fact alone would not be enough to defeat summary judgment. *See, e.g.*, *Vatel v. Alliance of Auto. Mfrs.*, 679 F. Supp. 2d 15, 17 (D.D.C. 2010), *aff'd*, 627 F.3d 1245 (D.C. Cir. 2011). But when considered alongside Jacobs' other arguments and evidence calling into question the legitimacy of the FBI's performance-based rationale, the fact that Jacobs' ouster from the EEO Office occurred in the broader context of a demographic swing from approximately 38% male EEO Investigators to none provides at least some additional evidence from which a jury could infer pretext on this record.

\* \* \*

The Court is mindful that, at the end of the day, the salient question is whether the FBI "honestly believes in the reasons it offers," *Fischbach*, 86 F.3d at 1183, even if those reasons "may

turn out to be false," *George*, 407 F.3d at 415. So it would not be enough for Jacobs to simply raise questions about whether the FBI made a decision that was unwise, uninformed, or even plain wrong. But for the reasons explained, Jacobs did more. The points the Court has discussed, at least when combined, rest on enough evidence to allow for the prospect that a reasonable jury could find the FBI's rationale to be false. Put another way, the Court cannot say that no reasonable jury could find in Jacobs' favor on these facts. But that doesn't mean Jacobs isn't going to have his work cut out for him at trial. After all, the FBI marshaled meaningful arguments against Jacobs' theory of sex discrimination, and a jury may well credit them based on a full presentation at trial. But on the record at this juncture, the Court concludes that a faithful application of Rule 56 and the governing legal standards requires that it afford Jacobs a chance to make his case.

## CONCLUSION

For the reasons explained above, the court **DENIES** the FBI's motion for summary judgement. The Court will issue a separate order so stating.

Dated: July 2, 2025

MATTHEW J. SHARBAUGH<br>United States Magistrate Judge